## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                                                 SUPERIOR COURT

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE

2021 DEC 28   A 9: 52

MICHAEL JOSEPH DONOVAN
CLERK/MAGISTRATE

TRAVELCENTERS OF AMERICA INC.,                )
                                              )
    *Plaintiff,*                                  )
                                              )
v.                                            )   Civil Action No. 21-2935
                                              )
IRONSHORE SPECIALTY INSURANCE COMPANY )
and LEXINGTON INSURANCE COMPANY,              )
                                              )
    *Defendants.*                                )

RECEIVED 2 8 2021

SUPERIOR COURT-CIVIL
MICHAEL JOSEPH DONOVAN
CLERK/MAGISTRATE

### COMPLAINT AND REQUEST FOR DECLARATORY JUDGMENT, COMPENSATORY DAMAGES, AND OTHER APPROPRIATE RELIEF

TravelCenters of America Inc. ("TA"), by and through its undersigned attorneys, makes

this Complaint for Declaratory Judgment, compensatory damages, and other appropriate relief

against Ironshore Specialty Insurance Company and Lexington Insurance Company (collectively,

the "Insurers") in this Court pursuant to the provisions in the relevant insurance policy.

## I.  INTRODUCTION

1.     TA is a publicly traded operator and franchisor of full-service travel centers

located along major highways in 44 states and Canada.  It owns and/or operates more than 230 of

these centers, principally under the TA®, Petro Stopping Centers®, and TA Express® brands

(collectively the "Travel Center Locations").

2.     At the Travel Center Locations, approximately 18,000 employees operate, among

other things, fuel stations, truck maintenance and repair facilities, full- and quick-service

restaurants, travel stores, truck parking, gaming facilities, truck scales, ministry services, medical

services, fitness facilities, laundry areas, business centers, and check-cashing operations.

3.     The Travel Center Locations are ordinarily open all day, every day.

4.      Defendants insured TA's portfolio of Travel Center Locations under a broad, "all-risk" Commercial Property Policy with up to $250,000,000 in limits (the "Policy").[1] Each Defendant shares in part of the Policy, which includes a common policy form and Defendant-drafted endorsements.

5.      The Policy has an effective period of June 30, 2019, to June 30, 2020, and an Extended Period of Recovery of up to 365 days.

6.      The Policy provides maximum coverage for Business Interruption losses "caused by direct physical loss, damage or destruction" to the Travel Center Locations "by a peril insured by this Policy."

7.      The Travel Center Locations sustained direct physical loss <u>and</u> damage commencing in March 2020 and continuing to present, by a peril insured by this Policy.[2]

8.      Symptomatic, pre-symptomatic, and asymptomatic employees and customers infected with COVID-19 (a highly contagious and potentially deadly communicable disease) have been on-site at each of the Travel Center Locations on a frequent, regular, and consistent basis over the course of the pandemic.

9.      Specifically, more than 900 Travel Center employees have been diagnosed with COVID-19, many of whom were on-site just days before their diagnosis.

10.      In addition, based on reliable statistical modeling, more than 750 customers with COVID-19 have been on-site every day since March 2020 across all Travel Center Locations.

---

[1] Unless otherwise indicated, terms that are initial- or all-capitalized, in boldface, or set off by quotation marks are taken from the Policy.

[2] This case is <u>not</u> about purely economic losses incurred as a result of governmental orders.

11.     While on-site, the infected individuals shed SARS-CoV-2 (the causative agent of COVID-19) through normal breathing, talking, and other ways, into the indoor air and onto surfaces throughout the Travel Center Locations.

12.     Once shed, these infectious particles remain in and travel through the air. They then settle on surfaces, adhering through gravitation and electrostatic forces.

13.     This results in direct physical loss <u>and</u> damage to the Property Insured at Travel Center Locations in a number of ways, including the following:

     (a)     Individuals infected with COVID-19, shedding SARS-CoV-2, directly, physically, and tangibly change, alter, and transform the content of the indoor air and the composition of the surfaces throughout the buildings and structures at the Travel Center Locations—such that now they contain a concentration of SARS-CoV-2 infectious particles (whereas before they <u>did not</u>).

     (b)     The intrusion of COVID-19 and SARS-CoV-2 onto the Travel Center Locations has rendered the properties unfit for their insured use: fully operational, multi-service travel centers. This is precisely the impact that ammonia, airborne asbestos fibers, toxic fumes (including carbon monoxide), pervasive odors, and/or wildfire smoke have on property—all of which have been found by courts to cause direct physical loss or damage to property.

14.     Since March 2020, the Travel Center Locations have engaged in extraordinary measures to address COVID-19 and SARS-CoV-2 on-site and its associated physical impact by, among other things, closing certain operations and services, substantially modifying others, and undertaking extensive efforts to repair and restore the facilities to their pre–COVID-19 and SARS-CoV-2 physical operating condition (a process which is ongoing).

15.     However, due to the high volume of employees and customers at the Travel Center Locations on a daily basis and the prevalence of infection among these individuals, COVID-19 and SARS-CoV-2 have been consistently present at, and are constantly being reintroduced to, the Travel Center Locations.

16.     As a result, COVID-19 and infectious SARS-CoV-2 particles have been pervasive and omnipresent at the Travel Center Locations over the course of this pandemic, and their complete elimination from the real and personal property at the Travel Center Locations, including indoor air and surfaces, has been impossible notwithstanding TA's best efforts.

17.     The actual presence of COVID-19 and SARS-CoV-2 on-site at each of the Travel Center Locations, and the associated physical loss and damage, has caused TA to experience crippling Business Interruption losses and to incur Extra Expenses (among other damages), which continue as the properties have not been restored to pre-pandemic physical operating conditions despite TA's best efforts.

18.     Separately and independently by endorsement, the Policy also covers communicable disease even where there is no "direct physical loss, damage or destruction" under ENDORSEMENT NO. 6: COMMUNICABLE DISEASE CONTAMINATION.

19.     The foregoing provisions are clearly triggered under the circumstances, yet the Insurers predetermined that they would not cover TA's COVID-19 claim ("Claim").  Therefore, the Insurers failed to conduct a meaningful investigation of the Claim, concertedly refused to acknowledge that the presence of COVID-19 at the Travel Center Locations satisfied the Policy, forced TA into engaging in time-consuming and onerous information gathering and communications to substantiate the Claim, failed to act reasonably upon TA's communications with respect to the Claim, and denied coverage for the Claim without reasonable justification.

20.     The Insurers' "investigation" into the Claim was a sham from the start.  In response to Plaintiff's June 3, 2020, notice, the Insurers' designated adjuster, McLarens Young International ("McLarens"), sent TA a boilerplate reservation of rights letter on June 17, 2020, accompanied by two pages of questions, several of which McLarens knew were impossible to answer and were solely designed to lead to one result: denial of the Claim.  The Insurers did not even bother to analyze the Policy or the facts of the Claim before circulating the initial reservation.

21.     By letter dated September 23, 2020, TA confirmed "physical loss, damage or destruction" to insured property due to "the presence of COVID-19 [and SARS-CoV-2 on-site at the Travel Center Locations, which] causes tangible, demonstrable alteration to [TA's] property by, among other things, contaminating surfaces and indoor air."

22.     In this letter, TA explained to the Insurers that the pollution-related exclusions in the Policy clearly and obviously do not apply for multiple reasons, including that COVID-19 (an idiopathic disease) and SARS-CoV-2 (its causative agent) in common parlance are not "pollutants," and they most certainly do not involve the "release, discharge, escape or dispersal" of pollutants, which define the limited and narrow scope of the exclusion.  It was and is intellectually dishonest for the Insurers to suggest otherwise.

23.     By letter dated March 2, 2021, TA provided the Insurers with extensive information about the presence of individuals infected with COVID-19 at the Travel Center Locations, and TA's associated Business Interruption losses.  This information demonstrated that as of December 2020, at least 381 employees across 87 Travel Centers had been positively diagnosed with COVID-19, and that TA had incurred more than $42 million of Business Interruption losses at these locations.  Separately, and in addition, TA presented an analysis

conclusively demonstrating to a statistical certainty that hundreds of COVID-19-positive customers were present across the Travel Center Locations every single day from the beginning of the pandemic.

24.     By letter dated August 11, 2021, TA submitted to the Insurers detailed information that TA had incurred more than $2 million in COVID-19 cleanup, removal, repair and restoration costs at these 87 locations.

25.     For nearly 15 months, the Insurers deceived TA into thinking that they were actively investigating the Claim and would give due weight to the information TA provided.  The Insurers' conduct was all for show.  Ultimately, they denied all claims and refused to pay any part of TA's Claim under any coverage provision, including the coverage provisions that specifically and undeniably apply to communicable disease contamination losses.

26.     The Insurers' conduct summarized above constitutes a breach of contract, breach of the covenant of good faith and fair dealing, and bad faith and improper claims handling in violation of Massachusetts General Laws ("M.G.L.") c. 93A, Section 11, and c. 176D, Section 3, warranting an award of compensatory and punitive damages, plus legal fees and costs, which are automatic where (as here) there has been a violation of the statute.

## II. JURISDICTION AND VENUE

27.     Plaintiff TA seeks a declaratory judgment pursuant to pursuant to M.G.L. c. 231A, § 1, because an actual controversy exists between TA and the Insurers as to their respective rights and obligations under the Policy.  More particularly, TA is insured under the Policy issued and subscribed to by the Insurers and seeks a declaratory judgment or decree that the Policy's coverage extends to losses sustained by TA.

28.    TA also seeks a judgment against the Insurers for breach of contract and violation of their respective and collective obligations to investigate and cover TA's claims in good faith pursuant to common law and M.G.L. c. 93A, Section 11, and c. 176D, Section 3.

29.    Jurisdiction over the subject matter of this action lies with this Court pursuant to M.G.L. c. 212 § 3 and M.G.L. c. 231A, § 1.

30.    Jurisdiction over the Defendants in this action is proper in this Court because each of the Insurers regularly transacts business in the Commonwealth.  The Insurers also agreed contractually, through the Policy, to "submit to the exclusive jurisdiction" of a court in "any applicable state in the United States."  (Exhibit A at 13; see also Exhibit C at 3 ("each party agrees to submit to the exclusive jurisdiction of the court of the USA").)[3]

31.    Venue for this action is proper in this Court pursuant to M.G.L. c. 223, §§ 1, 8, because the Defendant Insurers are Massachusetts companies that have a usual place of business in this County.

**III. PARTIES**

32.    TA is a corporation organized under the laws of Maryland with its principal office at 24601 Center Ridge Road, Westlake, Ohio.  TA also has a usual place of business at Two Newton Place, 255 Washington Street, Newton, Massachusetts; this address is identified as a usual place of business for TA on the Policy.  Prior to August 2019, including at the time the

---

[3] Attached as Exhibits A through I are true and correct copies of the subscription insurance policies that each insurer, including the Insurers, sold to TA to evidence that insurer's subscription to and participation in the Policy.  For clarity, quotations to the Policy herein are to the subscription insurance policy issued by Tokio Marine America Insurance Company ("TMAIC") attached as Exhibit A, which incorporates the common policy form also included in the other insurers' respective subscription insurance policies.  References to other insurers' subscription insurance policies (including endorsements) are supplied where relevant.  The term "Policy" as used herein refers to the collection of all insurers' subscription policies together.

Insurers sold the Policy to TA in June 2019, TA was a limited liability company (TravelCenters of America LLC) organized under the laws of Delaware.

33.     Upon information and belief, Defendant Ironshore Specialty Insurance Company ("Ironshore") is a corporation incorporated under the laws of Arizona, with its principal place of business located at 175 Berkeley Street, Boston, Massachusetts.  Ironshore is, among other things, in the business of issuing insurance policies to companies such as TA.

34.     Upon information and belief, Defendant Lexington Insurance Company ("Lexington") is a corporation incorporated under the laws of Delaware, with its principal place of business located at 99 High Street, Boston, Massachusetts.  Lexington is, among other things, in the business of issuing insurance policies to companies such as TA.

## IV. COVERAGE UNDER THE POLICY

### A.  The Policy covers physical loss or damage.

35.     The Insurers sold TA the Policy for the period from June 30, 2019, to June 30, 2020 (Policy Period), with an Extended Period of Recovery of up to 365 days, in exchange for TA's payment of significant insurance premiums.  TA is a First Named Insured on the Policy.

36.     TA's business manager, advisor, and agent in Massachusetts procured the Policy. The Policy consists of a common policy form and a series of Defendant-drafted endorsements.

37.     The Policy provides $250 million in coverage against "all risks of direct physical loss, damage or destruction" to the "type of property insured hereunder . . . except as hereinafter excluded."  (Exhibit A at p. 15.)

38.     In this grant of coverage, the term "loss" is separate and distinct from, and has an independent meaning than, the phrases "damage" or "destruction" under the Policy.

39.     The Policy does not define the individual terms "loss," "damage," or "destruction" or the entire phrase "direct physical loss, damage or destruction."

40.     Moreover, the Policy <u>does not</u> require a "structural" alteration to trigger coverage. Nonetheless, negative physical alterations (including physical alterations to buildings and structures) as described herein have occurred at the Travel Center Locations.

41.     In addition, the Policy <u>does not</u> require a "permanent" impact to trigger coverage. Rather, the physical impacts described herein at the Travel Center Locations are ongoing and persistent, require repairs and restoration efforts, and cannot be remedied by cleaning and/or disinfecting as described below.

42.     The "Property Insured" under the Policy means the "insurable interest of the Insured [TA] in all real and personal property . . . at a 'location' or within 1000 feet thereof." (<u>Id.</u> p. 15.) "Location," means a "site listed on the most recent statement of values on file with the Insurer" and further includes surrounding buildings or yards bounded by "public streets [or] clear land space . . . each not less than fifty feet wide." (<u>Id.</u> p. 53.)

43.     The Travel Centers Locations each are "Locations."

44.     TA's real and personal property, including the Travel Center Locations, their respective buildings, structures, yard areas, and the contents at those Locations (including the indoor air and surfaces, such as fixtures, equipment, furniture, etc.) are "Property Insured" under the Policy.  (<u>See</u> <u>id.</u>)

45.     The Policy lists 15 categories of real or personal property that are excluded.  The list includes crops, timber, land, water, animals, watercraft, aircraft, motor vehicles, off-shore property, satellites and spacecraft, underground mines and mining equipment, waterborne shipments, property sold under conditional sale, and transmission and distribution lines, <u>none</u> of which are at issue here.  (<u>Id.</u> p. 23-24.)  The excluded property list <u>does not</u> include either indoor air or surfaces.

**B. The Policy covers Business Interruption, Extra Expenses, Communicable Disease Contamination and other losses and expenses.**

46.     The Policy affords coverage for Business Interruption loss up to $250,000,000. (Id. p. 7.)  It insures "loss resulting from the necessary interruption or reduction of business operations conducted by the Insured and caused by direct physical loss, damage or destruction, of the property of the type insured hereunder, by a peril insured by this Policy." (Id. p. 24.)

47.     The loss recoverable is "'Actual Loss Sustained' by the Insured during the Period of Recovery resulting from the interruption or reduction of operations." (Id. p. 25.) "Actual Loss Sustained" is defined as "the reduction in 'Business Interruption Gross Earnings' less charges and expenses that do not necessarily continue during the interruption or reduction of the business operations." (Id.)

48.     The Period of Recovery for Time Element coverage is "such length of time required with the exercise of due diligence and dispatch to rebuild, repair or replace lost, damaged or destroyed property and to make such property ready for operations under the same or equivalent physical and operating conditions that existed prior to the loss[.]" (Id. p. 31.)

49.     The Policy's Declarations indicate that the Period of Recovery is extended (regardless of the end of the Policy Period) up to 365 days.  (Id. at 10).

50.     The 365 day Extended Period of Recovery affords coverage during the period that the Insured takes to return the business to its pre-loss business condition.

51.     The 365 day Extended Period of Recovery begins after the Period of Recovery has terminated and continues, up to 365 days, "to restore the Insured's business to the condition that would have existed had no 'Time Element' loss occurred." (Id. p. 32.)

52.     The Policy also affords various other relevant coverages (with different sublimits) that apply either in addition to or as an alternative to "Time Element" coverage, including the following:

53.     It provides $100 million of coverage for **Extra Expense**, which is defined as "the reasonable and necessary extra costs incurred by the Insured during the Period of Recovery to temporarily continue as nearly normal as practicable the conduct of the Insured's business and extra costs of temporarily using property of the Insured."  (Id. p. 28.)

54.     It provides $15 million of coverage for **Attraction Property**, which insures the "actual business income loss sustain[ed] by the Insured and extra expense caused by the direct physical loss or damage by a covered cause of loss to property of the type insured under this policy that attracts business to a covered location, provided that such property is within the distance [30 miles] from the covered location as shown in the Limits of Liability under Attraction Property."  (Id. p. 31.)

55.     The Policy provides $25 million coverage for **Contingent Time Element**, which insures the "actual loss sustained by the Insured" with respect to "direct physical loss or damage to real or personal property of a direct supplier or direct customer of the Insured" which: "a. wholly or partially prevents any direct supplier to the Insured from supplying their goods and/or services to the Insured, or b. wholly or partially prevents any direct customer of the Insured from accepting the Insured's goods and/or services."  (Id. p. 33.)

56.     It provides $250 million of coverage for **Ingress/Egress**, which insures the "loss sustained during the period of time when, as a result of direct physical loss, damage or destruction by a peril insured by this Policy within five (5) miles of an insured 'location,' normal

business operations are interrupted or reduced because ingress to or egress from that 'location' is prevented or impaired." (Id. p. 34.)

57.     It provides $250 million of coverage for **Interruption by Civil or Military Authority**, which insures the "loss sustained during the period of time when, as a result of direct physical loss, damage or destruction or imminent loss by a peril insured by this Policy within five (5) miles of an insured 'location,' normal business operations are interrupted or reduced because access to that 'location' is prevented or impaired by order of civil or military authority." (Id.)

58.     It provides $2.5 million coverage for **Communicable Disease Contamination**, which insures communicable disease extra expenses and losses that TA incurs based on a separate and independent coverage trigger: "an order of the health authority during the policy period that results in a partial or total suspension of your business operations at your covered locations." (Id. p. 61.)

        (a)     In this coverage, communicable disease means "Illness sustained by any person who is or was at the insured location resulting from . . . any human infectious or human contagious disease [], an outbreak of which the competent local authority has stipulated shall be notified to them." (Id.)

        (b)     Order of the health authority means "a written order partially or totally suspending your business operations due to the presence of a communicable disease at your covered location issued by a governmental health authority having jurisdiction over such business operations." (Id.)

        (c)     Communicable disease extra expense means "reasonable and necessary expenses" to "[c]leanup, remove and dispose of any property at your covered location

that is contaminated by the presence of a communicable disease," and to "[r]estore [the Travel Center Locations] to their original condition." (Id.)[4]

**C.  The Policy shares its $250,000,000 limit among multiple carriers.**

59.     The $250,000,000 limit of the Policy is shared among a group of insurers, including the Insurers, that each contracted to accept responsibility for a designated percentage share of the Policy's overall limit of coverage.  That is, the Insurers subscribed to "quota shares" within the Policy at designated participation levels.

60.     Each Insurer executed a subscription insurance policy with TA to effectuate its participation in the Policy at its designated subscription level.  Each Insurer's subscription insurance policy with TA incorporates the common policy form that the Insurer modified with Insurer-drafted endorsements that apply to that particular Insurer's subscription insurance policy.  The Policy provides uniform coverage to TA except as modified by these Insurer-drafted endorsements.

61.     The several subscription insurance policies are part of and collectively compose the Policy.

62.     The following chart identifies the percentage share of the Policy that each insurer sold to TA, along with the policy number each insurer assigned to its subscription insurance policy with TA.[5]

---

[4] The subscription insurance policy that insurer Certain Underwriters at Lloyd's, London ("Lloyd's") sold to TA does not provide Communicable Disease Contamination coverage.  That omission, however, has no effect on (and, specifically, does not reduce) the $2.5 million sublimit stated in Policy and payable in full by the other insurers.
[5] The subscription insurance policy that insurer XL Bermuda sold to TA requires the parties to resolve disputes regarding performance through arbitration or mediation.  As a result, TA has not named XL Bermuda as a defendant here.

| | **THE TA POLICY** | | | |
| | **-$250 Million-** | | | |
| **Layer** | **Carrier** | **Number** | **Percentage Participation** | **Coverage Afforded** |
|---|---|---|---|---|
| -$10M- | Starr Surplus Lines Insurance Company ("Starr") | SLSTPTY11203919 | 27.5% | $2.75M |
| | Lloyd's | B080119451U19 | 25% | $2.5M |
| | TMAIC | LCP6481222-00 | 20% | $2M |
| | Allied World Assurance Co., (U.S.) Inc. ("AWAC") | 0311-9197-1A | 20% | $2M |
| | Continental Casualty Company ("Continental") | 6073108925 | 7.5% | $750,000 |
| -$5M- | Starr | SLSTPTY11203919 | 27.5% | $1.375M |
| | Hallmark Specialty Insurance Company ("Hallmark") | 73PRX19A1D3 | 25% | $1.25 |
| | AWAC | 0311-9197-1A | 20% | $1M |
| | TMAIC | LCP6481222-00 | 20% | $1M |
| | Continental | 6073108925 | 7.5% | $375,000 |
| -$15M- | Starr | SLSTPTY11203919 | 27.5% | $4.125M |
| | Hallmark | 73PRX19A1D3 | 25% | $3.75M |
| | Ironshore | 004119600 | 20% | $3M |
| | TMAIC | LCP6481222-00 | 20% | $3M |
| | Continental | 6073108925 | 7.5% | $1.125M |
| -$20M- | Lexington | 021565822 | 50% | $10M |
| | Princeton Excess and Surplus Lines Insurance Company ("Princeton") | 78-A3-XP-0000603-00 | 30% | $6M |
| | TMAIC | LCP6481222-00 | 20% | $4M |
| -$30M- | Lexington | 021565822 | 50% | $15M |
| | Princeton | 78-A3-XP-0000603-00 | 30% | $9M |
| | TMAIC | LCP6481222-00 | 20% | $6M |
| -$150M- | Lexington | 021565822 | 50% | $75M |
| | XL Bermuda | XL PRP 2160450 19 | 50% | $75M |

63.    The following coverage chart depicts the same information about the several

Insurers subscribing to and participating in the Policy.  The dollar values along the y-axis reflect

the attachment points of the Insurers' subscription insurance policies with TA.  The percentage share in each coverage square is the Insurer's participation in the Policy at an identified layer. All percentages across the x-axis add up to 100%.

| "All Risk" | | | | |
|---|---|---|---|---|
| $250M | | | XL Bermuda 50.0% | |
| $100M | | | TMAIC 20.0% | Princeton 30.00% |
| $50M | | | TMAIC 20.0% 20.0% | Princeton 30.00% 30.00% |
| $30M | Ironshore 20.0000% | Starr 27.5% | Continental 7.500% | TMAIC 20.0% | |
| $15M | AWAC 20.000% | Starr 27.5% | Continental 7.500% | TMAIC 20.0% | |
| $10M | AWAC 20.000% | Starr 27.5% | Continental 7.500% | TMAIC 20.0% | 25.00% |

**D.  COVID-19/SARS-CoV-2 caused physical loss <u>and</u> damage covered by the Policy.**

64.     Since the onset of the pandemic, at least 900 TA employees were diagnosed with COVID-19.  Most of these employees were on-site in close proximity in time to their diagnosis.

65.     Moreover, based on reliable statistical modeling, more than 750 individuals with COVID-19 have been on-site every day across all of the Travel Center Locations since the onset of the pandemic.

66.     Taken together, more than 75,000 COVID-19 positive individuals were on-site at the Travel Center Locations from March through June 2020 alone.  As a result, COVID-19 (the

communicable disease) and SARS-CoV-2 (its causative agent) have been continuously present (and regularly reintroduced) at each of the Travel Center Locations since March 2020 through the present.

67.     These COVID-19 positive individuals constantly shed infectious SARS-CoV-2 particles into the indoor air and onto surfaces throughout the Travel Center Locations. The indoor air and surfaces are real and personal property in which TA has an insured interest under the Policy and neither are excluded.

68.     Shedding SARS-CoV-2 into the indoor air and onto surfaces throughout the Travel Center Locations physically and tangibly changes, alters, and transforms the content of the indoor air and the composition of the surfaces throughout the buildings and structures—such that now they contain concentrations of SARS-CoV-2 infectious particles (whereas, before they did not). This caused and continues to cause direct physical damage to the insureds' interests in real and personal property at the Travel Center Locations as covered under the Policy.

69.     The intrusion of COVID-19 and SARS-CoV-2 at the Travel Center Locations has rendered the physical operations unfit for their insured use: fully operational, multi-service travel centers.

70.     This intrusion of COVID-19 and SARS-CoV-2 at the Travel Center Locations happened by chance, rather than by design; it was, thus, an unfortunate event and "fortuitous" for insurance coverage purposes.

71.     The physical changes to the content of the indoor air and the composition of the surfaces throughout the buildings and structures at each Travel Center Location have been pervasive and omnipresent over time in light of the number of infected individuals shedding SARS-CoV-2 particles on-site and constant reintroduction.

72.     The Travel Center Locations have been unable to entirely eradicate COVID-19 and SARS-CoV-2 from the real and personal property at the Travel Center Locations despite extraordinary efforts to eliminate both and to repair and restore the property to its pre-pandemic physical operating condition.

73.     As a result of the physical impact, change, alteration, damage and loss from COVID-19 and SARS-CoV-2, Travel Center Locations have had to, among other things, close certain operations and services, substantially modify others, and undertake efforts to repair and restore the facilities to their pre–COVID-19/SARS-CoV-2 physical operating condition (a process which is ongoing).

### E. TA's physical loss <u>and</u> damage triggers multiple coverages under the Policy.

#### 1.     Time Element coverage

74.     Time Element coverage is triggered by "direct physical loss, damage or destruction of the property" resulting in "the necessary interruption or reduction of business operations conducted by the Insured . . . by a peril insured by this Policy." (<u>Id.</u> pp. 24-25.)

75.     As alleged above, the physical alteration and change to the content of the indoor air and the composition of the surfaces throughout the buildings and structures at each Travel Center Location as a result of individuals infected with COVID-19 shedding SARS-CoV-2 particles is direct physical damage of insured property (including indoor air and surfaces).

76.     As alleged above, the unplanned intrusion of COVID-19 and SARS-CoV-2 onto the property causing it to be unfit for its full insured use is direct physical loss of the insured property.

77.     This direct physical loss <u>and</u> damage of insured property has resulted in "the necessary interruption or reduction" of TA's business operations at the Travel Center Locations.

78.     This direct physical loss and damage of insured property was caused by the introduction of COVID-19 and SARS-CoV-2, perils insured by the "all-risk" Policy, and not within any coverage exclusions.

79.     Because the Travel Center Locations sustained direct physical loss and damage of insured property caused from COVID-19 and SARS-CoV-2, perils insured under the Policy, and because the direct physical loss and damage of insured property from these perils resulted in the necessary interruption or reduction of TA's business operations, the Policy's Time Element coverage has been triggered.

80.     In March 2021, TA identified to the Insurers that as of December 2020, it had incurred more than $42 million in Business Interruption losses at 87 Travel Center Locations where 381 employees had positive COVID-19 diagnoses.  These Business Interruption losses are due to the facts as alleged in the preceding paragraphs (and elsewhere herein).

81.     These Business Interruption losses are ongoing as efforts to repair and restore the property to its pre-pandemic physical operating condition continue.

**2.     Other relevant coverages**

82.     **Extra Expense** coverage is triggered by the same direct physical loss and damage at the Travel Center Locations as Time Element coverage.

83.     Because the Time Element coverage is triggered as discussed above, the Extra Expense coverage is also triggered, and permits TA to recover the "the reasonable and necessary extra costs incurred by the Insured during the Period of Recovery to temporarily continue as nearly normal as practicable the conduct of the Insured's business and extra costs of temporarily using property of the Insured."  (Id. p. 28.)

84.     **Attraction Property** coverage is triggered by the direct physical loss and damage caused by COVID-19 and SARS-CoV-2 (in the same manner that it causes physical loss or

damage at the Travel Center Locations) at properties that directly attract business to the Travel Center Locations.

85.     Because properties that directly attract business to the Travel Center Locations sustained direct physical loss or damage caused by COVID-19 and SARS-CoV-2, the Policy's Attraction Property coverage has been triggered.

86.     **Contingent Time Element** coverage is triggered by the direct physical loss or damage caused by COVID-19 and SARS-CoV-2 (in the same manner that it causes physical loss and damage at the Travel Center Locations) at properties of suppliers and customers of the Travel Center Locations.

87.     Because properties of suppliers and customers of the Travel Center Locations sustained direct physical loss or damage caused by COVID-19 and SARS-CoV-2, the Policy's Contingent Time Element coverage has been triggered.

88.     **Ingress/Egress** coverage is triggered by the prevention of direct ingress to and egress from the Travel Center Locations caused by direct physical loss and damage caused by COVID-19 and SARS-CoV-2 at the Travel Center Locations.

89.     Because direct physical loss and damage caused by COVID-19 and SARS-CoV-2 prevented direct ingress to and egress from the Travel Center Locations, the Policy's Ingress/Egress coverage has been triggered.

90.     **Interruption by Civil or Military Authority** coverage is an alternative coverage that is triggered when, as a result of direct physical loss, damage or destruction due to a covered peril at a location <u>other than</u> a Travel Center Location (and within a five mile radius), civil or military authorities issue orders that prevent access to the Travel Center Locations, impacting

normal business operations at the Travel Center Locations.  The requisite civil or military orders need not be directed to TA specifically.

91.     Because the Travel Center Locations sustained necessary interruption to their business directly resulting from civil authority orders prohibiting or limiting access to the Travel Center Locations because of direct physical loss, damage or destruction at any location within five miles of a Travel Center Location, the Policy's Interruption by Civil or Military Authority coverage has been triggered.

**F.  The presence of COVID-19 at TA's covered locations triggers the endorsed Communicable Disease coverage.**

92.     **Endorsement No. 6: Communicable Disease Contamination** coverage is triggered by the presence of communicable disease on-site and health-authority orders suspending or limiting business operations at the Travel Center Locations.  This coverage provides for recovery for resulting business interruption losses and communicable disease extra expense in the absence of "direct physical loss, damage or destruction."

93.     Because TA had COVID-19 on-site at the Travel Center Locations, and COVID-19 is indisputably a communicable disease; and because each Travel Center Location was subject to health-authority orders restricting business operations at the Travel Center Locations because of COVID-19, the Policy's Communicable Disease Contamination coverage has been triggered.  The requisite health-authority orders do not need to be directed to TA specifically.

**G.  The pollution-related exclusions do not apply.**

**1.     The POLLUTION, CONTAMINATION exclusion in the common policy form.**

94.     The Policy contains a "POLLUTION, CONTAMINATION" Exclusion that addresses property loss and damage "caused by, resulting from, contributed to or made worse by actual, alleged or threatened release, discharge, escape or dispersal of 'contaminants or

pollutants,' all whether direct or indirect, proximate or remote or in whole or in part arising from any cause whatsoever." (Id. p. 37.)

95.     The Policy defines "[c]ontaminants or pollutants" as "any material that after its release can cause or threaten damage to human health or human welfare or causes or threatens damage, deterioration, loss of value, marketability or loss of use of property insured by this Policy, including, but not limited to, bacteria, virus, or [specified] hazardous substances . . . ." (Id.)

### 2.     The corresponding exclusions in the Ironshore, Lexington, and AWAC subscription policies.

96.     The subscription insurance policy that Ironshore sold to TA ("Ironshore Subscription Policy") replaces the POLLUTION, CONTAMINATION exclusion with an Ironshore-specific POLLUTION, CONTAMINATION, DEBRIS REMOVAL EXCLUSION ENDORSEMENT.  The Ironshore provision excludes loss or damage "caused by, resulting from, contributed to or made worse by actual, alleged or threatened release, discharge, escape or dispersal of CONTAMINANTS or POLLUTANTS, all whether direct or indirect, proximate or remote or in whole or in part caused by, contributed to or aggravated by any physical damage insured by this policy." (Exhibit F, Endorsement #16, p. 1.)

97.     The Ironshore Subscription Policy defines CONTAMINANTS or POLLUTANTS to mean "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste, which after its release can cause or threaten damage to human health or human welfare or causes or threatens damage, deterioration, loss of value, marketability or loss of use to property insured hereunder, including, but not limited to, bacteria, fungi, virus, or [specified] hazardous substances[.]  Waste includes materials to be recycled, reconditioned or reclaimed." (Id.)

98.     The subscription insurance policies that Lexington ("Lexington Subscription Policy") and AWAC ("AWAC Subscription Policy") sold to TA also replace the POLLUTION, CONTAMINATION exclusion with insurer-specific endorsements titled POLLUTION, CONTAMINATION, DEBRIS REMOVAL EXCLUSION ENDORSEMENT that are identical in relevant part to the same exclusion in the Ironshore Subscription Policy.  (Lexington Subscription Policy, Exhibit G, Endorsement # 17, p. 1; AWAC Subscription Policy, Exhibit B, Pollution, Contamination, Debris Removal Exclusion Endorsement, p. 1.)

### 3.     The corresponding exclusion in the Continental subscription policy.

99.     The subscription insurance policy that Continental sold to TA ("Continental Subscription Policy") replaces the POLLUTION, CONTAMINATION exclusion in the Policy with an insurer-specific Contaminations or Pollutants Exclusion Endorsement.  The Continental Subscription Policy excludes "loss, costs or expense to covered property" caused by "the actual, alleged or threatened release, discharge, or dispersal of toxic or hazardous substances, Contaminants or Pollutants . . . ." (Continental Subscription Policy, Exhibit D, Contaminants or Pollutants Exclusion Endorsement, p. 1.)

100.     The Continental Subscription Policy defines Contaminants or Pollutants as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed."  (Id.)

### 4.     None of the foregoing pollution-related exclusions apply.

101.     The Insurers have not (and cannot) meet their heavy burden of demonstrating that the pollution-related exclusions listed above clearly and unmistakably apply to the Claim, and are not subject to any other reasonable interpretation.

102.    To the contrary, none of the pollution-related exclusions in the Policy apply to the Claim because the Claim does not involve any "release, discharge, escape or dispersal" of specified material, contaminants or pollutants (or similar language)—the common requirement of all of the pollution-related exclusions.

103.    The POLLUTANTS, CONTAMINANTS exclusion in the Policy and the alternate pollution-related exclusions in the subscription insurance policies sold by Ironshore, Lexington, and AWAC each preclude coverage only for the "release, discharge, escape or dispersal" of specified material, contaminants or pollutants that cause loss, damage or destruction." (Exhibit A p. 37; Ironshore Subscription Policy, Exhibit F, Endorsement #16; Lexington Subscription Policy, Exhibit G, Endorsement # 17, p. 1; AWAC Subscription Policy, Exhibit B, Pollution, Contamination, Debris Removal Exclusion Endorsement, p. 1.)  The alternate pollution-related exclusion in the Continental Subscription Policy also precludes coverage for the "release, discharge, or dispersal" of certain contaminants or pollutants.  (Continental Subscription Policy, Exhibit D, Contaminants or Pollutants Exclusion Endorsement, p. 1.)

104.    COVID-19 and SARS-CoV-2 are not the kind of "material" the pollution-related exclusions address.  The "material" in the pollution-related exclusions, including the POLLUTION, CONTAMINANTS exclusion in the Policy and alternatives in the various Insurers' subscription insurance policies, is reasonably limited to environmental contamination, such as discharge or seepage of hazardous waste or similar environmental-pollution liabilities, and not to a communicable disease (COVID-19) and its causative agent (SARS-CoV-2).

105.    Further, there never was damage, loss or destruction resulting from a "release, discharge, escape or dispersal" of COVID-19 and of SARS-CoV-2 from TA's insured property. COVID-19 is an idiopathic pandemic that spreads through modes of viral transmission (i.e.,

shedding).  No legitimate medical journal has referred to the process of human shedding of infectious SARS-CoV-2 particles as a "release, discharge, escape or dispersal of 'contaminants or pollutants.'"

106.     In addition, the pollution-related exclusions, including the POLLUTION, CONTAMINANTS exclusion in the Policy and alternatives in the various Insurers' subscription insurance policies, cannot apply because they directly conflict with an affirmative coverage grant in the Policy, namely the Communicable Disease Contamination coverage.

107.     The Communicable Disease Contamination coverage provides coverage for certain costs linked to the presence of a communicable disease on-site and health-authority orders regarding the same.

108.     The Policy cannot simultaneously provide coverage for Communicable Disease Contamination (indisputably including, but not limited to, the communicable disease COVID-19), yet purport simultaneously to exclude coverage for its causative agent (SARS-CoV-2) under environmental pollution-related exclusions, including the POLLUTION, CONTAMINANTS exclusion in the Policy and alternatives in the various Insurers' subscription insurance policies, on the theory that SARS-CoV-2 is an excluded "[c]ontaminant[] or pollutant[]" under the Policy.

109.     Further, nowhere do the Communicable Disease Contamination coverage provisions provide that they are exceptions or exemptions from the POLLUTION, CONTAMINANTS exclusion (or any alternatives).  To the contrary, the Communicable Disease Contamination Endorsement provides that "All other terms and conditions of the Policy remain the same."  (Exhibit A at p. 62.)

110.     Nor does the POLLUTION, CONTAMINANTS exclusion (or any alternative)
provide that the Communicable Disease Contamination coverage provisions are an exception or
exemption from the exclusion(s).

111.     The Policy does, however, use exceptions from exclusions in other instances.  For
example, the POLLUTION, CONTAMINATION exclusion contains an express exception for
the enforcement of laws applicable to the cleanup of pollution.  (Exhibit A at p. 37.)  Similarly,
the POLLUTION, CONTAMINATION exclusion and MOLD, MILDEW OR FUNGUS
exclusion each contain an express exception when the pollution, contamination, mold, mildew or
fungus loss is caused by a Listed Peril.  (Exhibit A at pp. 37, 38.)

112.     Likewise, the Policy uses exceptions to limit certain coverages.  For example, the
BOILER AND MACHINERY coverage expressly excepts coverage for loss or damage caused
by lightning.  (Exhibit A at p. 50.)

113.     The words of the Policy must be read in a manner that gives meaning to all
language and leaves no provision without force and effect; the words of the Policy, as chosen by
the Insurers that drafted them, must be honored as written.  This is particularly the case here,
where the words chosen for the POLLUTION, CONTAMINANTS exclusion (and any
alternatives) must be read strictly and narrowly, while the words chosen for the grant of
Communicable Disease Contamination coverage must be read broadly and in favor of TA.

114.     Nor can the words be read in a way that renders coverage illusory or which makes
no sense.

115.     Thus, consistent with these rules of construction and interpretation, the pollution-
related exclusions, including the POLLUTION, CONTAMINANTS exclusion in the Policy and
alternatives in the various Insurers' subscription insurance policies, cannot be read in a way that

would void the coverage afforded under the Communicable Disease Contamination coverage. Conflicting provisions within the Policy cannot be read to negate certain coverages or in ways that render some coverage provisions mere surplusage.

116.    To the extent the Insurers contend that the pollution-related exclusions, including the POLLUTION, CONTAMINANTS exclusion in the Policy and alternatives in the various Insurers' subscription insurance policies, bar coverage for loss caused by COVID-19 or SARS-CoV-2, the Policy is, at best, ambiguous because it is susceptible of more than one reasonable interpretation and, therefore, must be construed in favor of coverage.

117.    There are exclusions in common usage in the insurance industry that the Insurers could have included in the Policy to unambiguously exclude losses caused by communicable diseases, viruses, and pandemics.  The insurance industry has known the risks associated with pandemics for decades.  These risks have been even more pronounced and evident to the Insurers in recent decades due to SARS, Ebola, MERS, H1N1, and Zika.

118.    However, the Insurers decided not to include any such exclusions in the Policy. To the contrary, the Policy contains an express grant of coverage for Communicable Disease Contamination.

### 5.    The Mold Exclusion in the Continental subscription policy <u>does not</u> apply.

119.    The Continental Subscription Policy also includes an insurer-specific Mold Exclusion that excludes coverage for "any physical damage, direct or indirect, and any *Time Element*, direct or indirect, as a result of, occasioned by, in connection with, arising from the actual, perceived or threatened involvement of or happening through or in consequence of *Mold* . . . ." (<u>Id.</u>, Mold Exclusion Endorsement, p. 1.)

120.    The Continental Subscription Policy defines *Mold* as "(1) Any 'fungi'; (2) any mold, mildew, bacteria, virus, scent, spore, mycotoxin, or any other substance, product or byproduct produced by, released by, or arising out of the current or past presence of 'fungi'; (3) Any past, present, or potential future presence or growth of 'fungi' in or on any medium, material, product, building, or structure." (Id.)

121.    The Insurers cannot meet the heavy burden to prove that the Mold Exclusion in the Continental Subscription Policy clearly and unmistakably applies to the Claim and is not subject to any other reasonable interpretation.

122.    Although Continental's Mold Exclusion purports to exclude coverage for viruses, it only applies, by definition, to viruses that are "produced by, released by, or arising out of the current or past presence of 'fungi.'" (Continental Subscription Policy, Exhibit D, Mold Exclusion Endorsement, p. 1.).

123.    COVID-19 was not "produced by, released by, or arising out of" fungi, so the exclusion cannot apply.

## V.  INSURERS' BAD FAITH

### A.    Insurers failed to investigate.

124.    When TA submitted its claim for COVID-19 losses at and around the Travel Center Locations on June 3, 2020, the Insurers already intended to deny coverage. The Insurers then engaged in conduct that was intended to hide their predetermination and give the impression that they were actively investigating and considering the Claim, which had the effect of wasting extraordinary amounts of TA's time and money.

125.    In response to TA's June 2020 notice of claim, the Insurers' designated adjuster McLarens did not undertake any analysis of the Policy and/or the facts of the Claim. Instead, McLarens sent TA a list of questions by letter dated June 17, 2020, several of which it knew—or

27

would have known had it bothered to look—were impossible to answer, were inconsistent with the plain language of the Policy, did not apply to TA's operations at the Travel Center Locations, and were solely designed to lead to one result: denial of the Claim.

126.    For example, the McLarens questionnaire asked TA to "advise by whom [the discovery of COVID-19 on-site] was made." In June 2020, when the request was made, McLarens and the Insurers knew or should have known that the first "discovery" of on-site COVID-19 would have been anecdotal at that point in time and otherwise impossible to discern; no test kits for surfaces (or air for that matter) were readily available to the general public; and the only way to test for "contagious" viral particles would have been to utilize the services of a BSL-3 lab, which was not feasible for private testing of this nature. Furthermore, McLarens and the Insurers knew that PCR testing of individuals was done on an extremely limited basis (generally only in the healthcare setting) and antigen testing was not yet commercially available.

127.    The letter accompanying the June 17, 2020, questionnaire advised TA that the Insurers "will investigate" the Claim, but was silent as to the Insurers' position regarding the Claim, the implicated coverages at issue under the Policy, or any pertinent terms or conditions. Instead, the Insurers purported to reserve "all rights, privileges, and defenses under the Policy, at law, or otherwise," based on grounds for limitation or disclaimer of coverage "including but not limited to those set forth above." However, no defenses or limitations were identified "above" or elsewhere in the correspondence. The June 17, 2020, correspondence, like the attached questionnaire, made clear that the Insurers had not undertaken any analysis of the Policy or the facts pertinent to the Claim.

128.    Notably, on or about the same time as McLarens sent its initial questionnaire to TA, it sent verbatim questionnaires to TA's business manager in its separate role as agent for

other companies' insurance programs. This shows that McLarens and the Insurers did not
undertake even a cursory study of the Policy or the facts pertinent to the Claim before
distributing their standard information request and reservation letter.

129.   Two months later, on August 5, 2020, McLarens and the Insurers issued a
supplemental reservation of rights letter to TA that still failed to reflect any reasonable
investigation into the facts pertinent to the Claim. The Insurers stated that the Policy requires
"direct physical loss, damage or destruction to insured property," but took no position on
whether the Claim could trigger coverage.

130.   Instead, the Insurers trumpeted a series of provisions in the Policy that "may bar,
limit, or otherwise affect coverage" for the Claim including the "POLLUTION,
CONTAMINATION" exclusion (and any alternatives), even though, as explained herein, those
exclusions clearly and obviously do not apply for multiple reasons, including that COVID-19 (an
idiopathic disease) and SARS-CoV-2 (its causative agent) in common parlance are not
"contaminants or pollutants," and they most certainly are not the result of "release, discharge,
escape or dispersal."

**B.   Insurers ignored TA's initial submission.**

131.   By letter dated September 23, 2020, TA confirmed for the Insurers the presence
of COVID-19 and SARS-CoV-2 on-site at the Travel Center Locations. TA further advised the
Insurers that "the presence of COVID-19 [on-site] causes tangible, demonstrable alteration to
[TA's] property by, among other things, contaminating surfaces and indoor air." TA also
explained how SARS-CoV-2 infectious particles "attach[] to and can be transmitted through
surfaces." TA simultaneously disputed that the "POLLUTION, CONTAMINATION"
exclusion (or any alternatives) in the Policy barred coverage for the Claim, as set forth above.

132.    By letter dated November 16, 2020, the Insurers denied coverage based on the errant position that "[TA] has not actually identified any property that was physically affected by COVID-19." In fact, TA had specifically identified indoor air and surfaces as "property that was physically affected by COVID-19." The Insurers further took the unjustified position that the Claim turned on the mere "assumption that the virus causing COVID-19 is present at the insured locations." In fact, TA had advised the Insurers that COVID-19 was present on-site. Also, the Insurers mistakenly concluded that TA "intended for a virus to be a contaminant or pollutant" excluded under the Policy simply because TA purchased a Policy containing the "POLLUTION, CONTAMINATION" exclusion and alternatives. TA had offered the Insurers multiple reasons that the "POLLUTION, CONTAMINATION" exclusion (and any alternatives) in the Policy did not extend to COVID-19 and SARS-CoV-2, not the least of which being that the Policy affirmatively grants coverage for Communicable Disease Contamination, including contamination by viruses.

133.    In any case, at no time prior to issuing their September 23, 2020, and November 16, 2020, correspondence, nor at any time thereafter, did the Insurers even request an opportunity to visit and test a single Travel Center Location for the presence of COVID-19 and SARS-CoV-2.

**C.    Insurers prompted TA to submit additional information, which the Insurers also discarded.**

134.    Even though the Insurers had predetermined that they would not cover the Claim, they prompted TA to engage in time-consuming and costly efforts to gather and submit additional claim documentation and stated that they would consider it "without prejudice" to their already announced coverage denial. The Insurers meant to give the impression that they were investigating the Claim and evaluating coverage in good faith, and would be willing to

reconsider the Claim if TA submitted additional information. But in reality, the Insurers merely intended to create work for TA, to dissuade TA from pursuing the Claim, and to paint an inaccurate picture that TA was somehow delaying the Insurers' investigation or not cooperating.

135. By letter dated March 2, 2021, TA provided the Insurers with detailed and comprehensive information demonstrating that at least 381 employees across 87 Travel Center Locations had positive COVID-19 diagnoses, such that the SARS-CoV-2 virus had actually been present on-site. TA also offered statistical analysis that in addition to the known cases of COVID-19 among employees, hundreds of COVID-19 positive customers were present at each Travel Center Location on any given day. Furthermore, TA identified more than $42 million in business-interruption loss that it had incurred at the Travel Center Locations with at least one known case of COVID-19 among employees.

136. The Insurers wholly disregarded TA's information that a certain number of employees had been diagnosed with COVID-19. Instead, by letter dated April 1, 2021, the Insurers took the untenable position that "the statistical probability that COVID-19 was present at insured locations is an interesting theory, [but] it still does not confirm that COVID-19 was present at the insured locations."

137. While rejecting TA's March 2021 claim submission as insufficient, the Insurers' April 1, 2021, letter sought additional information to give the impression that they were actively investigating the Claim. As before, the Insurers' questions either were impossible or overly burdensome to answer or they requested immaterial information. For example, the Insurers required TA to show that its employees "contracted COVID-19 at the insured locations," which has no basis whatsoever in the Policy.

138.    TA advised the Insurers by letter dated May 11, 2021, that the Policy did not require TA to make the showings that the Insurers proposed to trigger coverage, and reaffirmed that it had provided the Insurers with ample and detailed information to support the Claim.

139.    By letter dated August 4, 2021, the Insurers provided TA with an outline of "what information TA must provide to establish a compensable claim under the [Policy's] Endorsement No. 6: Communicable Disease Contamination."  Unbeknownst to TA, the Insurers' apparent offer to review specific cost information as set forth in this communication was nothing more than arranging hoops for TA to jump through while the Insurers steadfastly denied coverage for the Claim.  The Insurers never had any intention of paying the Claim, and designed their continuing communications and information requests to delay the resolution of the Claim and to force TA to incur unnecessary costs to develop support.

140.    By letter dated August 11, 2021, TA responded to the Insurers' invitation by submitting significant financial information showing it had incurred more than $2.2 million in "Communicable disease extra expenses," such as additional and enhanced cleaning, sanitation, restoration materials and labor costs, at the 87 Travel Center Locations with at least one employee diagnosed with COVID-19 by December 2020.

141.    By letter dated August 30, 2021, the Insurers told TA that it was "premature for [TA] to demand a response as to whether certain types of extra expenses are covered, and to seek payment of the same," when "TA has not yet demonstrated" "the presence of a communicable disease(s) at a covered location."

142.    For nearly 15 months, the Insurers have pursued extraneous and never-ending information requests designed to mask their pretense of a claim investigation and pre-ordained coverage denial.  By continuing to demand additional information at the same time as they reject

or find insufficient the significant information that TA has submitted to date, and by willfully refusing to accept and acknowledge the presence of COVID-19 at the Travel Center Locations, the Insurers seek to hide the fact that they always intended to deny coverage regardless of TA's responses to their information requests.

143.    As a result of the Insurers' single-minded focus on denying the Claim no matter what information TA provides in support, among other things, the Insurers have failed to reach a prompt, fair and equitable settlement of the Claim, have engaged in conduct designed to deprive TA of its full policy benefits, and have forced TA to pursue this litigation to recover the insurance owed.

## COUNT I
### (Declaratory Relief)

144.    TA repeats and realleges the allegations in the preceding paragraphs.

145.    The Policy described above is a valid and enforceable insurance contract.  The specific duties and obligations of the Insurers that subscribed to the Policy are set forth in the subscription insurance policies identified above.  Each of the subscription insurance policies is a valid and enforceable insurance contract.

146.    TA performed all of the obligations and conditions precedent to coverage under the Policy and under each of the subscription insurance policies.  Any conditions or requirements of the Policy and of each subscription insurance policy, including the payment of all premiums, have been satisfied, waived, excused, or are otherwise inapplicable.

147.    The Policy provides maximum coverage for, among other things, physical loss, damage or destruction to the Travel Center Locations, TA's business-interruption losses, and extra expenses that TA incurred as a result of the physical loss and damage to TA's property.

148.     The Policy also provides sublimited coverage for business income loss and communicable disease extra expenses due to an order of the health authority resulting in the partial or total suspension of TA's business even where there is no physical loss, damage or destruction.

149.     TA submitted a claim for loss as a direct result of a covered cause of loss.  TA was denied coverage, or the Insurers effectively repudiated their obligations to provide coverage, under the Policy based on the Insurers' improper position that, among other things, TA has not suffered any direct physical loss, damage or destruction to its insured properties—the Travel Center Locations—as a result of the actual presence of COVID-19 and that any claim for loss or damage due to COVID-19/SARS-CoV-2 is excluded under Policy.

150.     An actual, justiciable controversy exists between TA and the Insurers concerning the availability and amount of coverage under the Policy for the Claim.

151.     The controversy between the Insurers and TA is ripe for judicial review.

152.     As a result, TA seeks a declaration from the Court that: (a) the Claim triggers the various coverage provisions identified above; (b) the Policy covers the Claim; (c) TA sustained direct physical loss, damage or destruction to insured interests in real or personal property from a covered cause of loss under the Policy; (d) no exclusion applies to bar or limit coverage for the Claim; and (e) granting any other declaratory relief useful to resolving the dispute between the parties.

## COUNT II
### (Breach of Contract)

153.     TA repeats and realleges the allegations in the preceding paragraphs.

154.     The Policy described above is a valid and enforceable insurance contract.  The specific duties and obligations of the Insurers that subscribed to the Policy are set forth in the

subscription insurance policies identified above.  Each of the subscription insurance policies is a valid and enforceable insurance contract.

155.    TA performed all of the obligations and conditions precedent to coverage under the Policy, and under each of the subscription insurance policies.  Any conditions or requirements of the Policy and of each subscription insurance policy have been satisfied, waived, excused, or are otherwise inapplicable.

156.    The Insurers breached the Policy and their subscription insurance policies by improperly denying coverage for the Claim or by otherwise repudiating their respective and collective obligations to cover TA's losses and expenses as expressly required under the Policy.

157.    TA has sustained and continues to sustain damages as a result of the Insurers' breach of the Policy and their subscription insurance policies.

158.    TA is entitled to damages as a result of the Insurers' breaches in an amount to be determined at trial, including compensatory and consequential damages, pre-judgment and post-judgment interest, attorneys' fees and costs, and any other costs and relief that this Court deems appropriate.

## COUNT III
### (Breach of the Covenant of Good Faith and Fair Dealing)

159.    TA repeats and realleges the allegations in the preceding paragraphs.

160.    Each of the Insurers is required to act in good faith, abstain from deception, and practice honesty and equity in all dealings with its policyholders, including TA, under the insurance policies it sells.

161.    Each of the Insurers owes a covenant of good faith and fair dealing to TA in light of the insurance relationship created by the Policy and the subscription insurance policies.

162.    The covenant of good faith and fair dealing obligates each party to the contract to refrain from taking any action that would deprive the other of the benefits of the contract or to cause undue hardship or harm to the other party.  It also requires insurers to exert as least an equal degree of attention and concern for the interests of the insured as it would for its own interests in any matter.

163.    The Insurers' conduct described in this Complaint and otherwise in investigating, handling, and denying the Claim under the Policy and the subscription insurance policies constitutes bad faith and improper claims handling.

164.    The Insurers denied the Claim without reasonable justification for the refusal despite having actual knowledge of the facts establishing coverage for TA's losses.  The Insurers willfully or recklessly ignored facts and information demonstrating that the Claim was within the coverage of the Policy, and adopted unsupported bases to deny coverage.

165.    The Insurers' denials were arbitrary and capricious.

166.    Furthermore, the Insurers acted in bad faith with respect to TA by and through the Insurers' unreasonable failure to adequately investigate the Claim and their failure to act with reasonable justification in denying TA the benefits to which it is entitled under the Policy.

167.    The Insurers' reaction to the Claim was to press TA to respond to overly burdensome, premature, or unnecessary information requests in an attempt to create time-consuming and costly work, to dissuade TA from pursuing the Claim, and to paint an inaccurate picture that TA was somehow delaying the Insurers' investigation or not cooperating and that the Insurers were investigating the Claim and evaluating coverage in good faith.  The unreasonable nature of those tactics is further demonstrated by the fact that, because the Insurers deny that the presence of COVID-19/SARS-CoV-2 amounts to physical loss and damage to insured property,

the Insurers always intended to deny coverage regardless of TA's responses to the Insurers' inquiries.

168.    In other words, the Insurers sought to hide their true position—that they had already decided to deny all COVID-19 claims, including the Claim—by going through the motions of a mock investigation and requesting immaterial and burdensome information time and again.

169.    In violation of their duties to TA, the Insurers acted in bad faith by, among other acts and omissions:

(a)    denying without reasonable justification their respective and collective obligations to pay Policy benefits or by repudiating their respective and collective obligations to pay benefits to TA when they knew or should have known they had an obligation to provide insurance coverage;

(b)    failing to exert as least an equal degree of attention and concern for TA's interests in recovering insurance benefits under the Policy as the Insurers had for denying coverage;

(c)    failing to conduct an adequate, complete, and proper investigation of the Claim and instead instituting a mock investigation process to hide their true position that they had already intended to deny coverage for all COVID-19 claims, including the Claim;

(d)    dragging their feet during the claims-handling and evaluation process by imposing unnecessary and burdensome information requests and pretending to consider them before proposing even more onerous information requests;

(e)    breaching their promise of security to TA by unreasonably and without justification reneging on the all-risk commercial property insurance policy benefits they promised to provide TA, leaving TA without the benefits of its insurance assets to operate its business during a pandemic.

170.    Upon information and belief, the Insurers' bad faith conduct and improper claims practices described above were perpetrated to withhold from TA the rights and benefits to which it is entitled under the Policy.

171.    Therefore, TA further requests that the Court award TA damages to account for the Insurers' breach of the covenant of good faith and fair dealing and improper claims practices, as described above, including compensatory and consequential damages, punitive damages, pre- and post-judgment interest, attorneys' fees and costs, and any other costs and relief that this Court deems appropriate.

172.    As a result of the Insurers' bad faith breach of its obligations under the Policy and their improper claims handling practices, TA has suffered and will continue to suffer substantial damages in an amount to be proven at trial, including additional loss of business-income and extra expense that it would not otherwise have needed to pay had the Insurers promptly made full payment of TA's losses covered under the Policy.

173.    TA further requests that the Court award the amount equal to the attorneys' fees and costs incurred by TA for the prosecution of this coverage action against the Insurers, which amount will be proved at or after trial.

## COUNT IV
### (Violation of M.G.L. c. 93A, Section 11 and/or c. 176D, Section 3)

174.    TA repeats and realleges the allegations in the preceding paragraphs.

175.    Massachusetts General Laws c. 93A, § 2, prohibits the use or employment of unfair or deceptive acts or practices in the conduct of trade or commerce.

176.    The conduct of the Insurers related to the Claim took place primarily and substantially in the Commonwealth of Massachusetts.  The Insurers are all engaged in the business of insurance in Massachusetts.  The Insurers have their usual places of business in Massachusetts, and, thus, directed their conduct with respect to the Claims from Massachusetts.  TA's legal department and certain executives and officers responsible for coordinating the Claim have their usual place of business in Massachusetts.  Moreover, TA submitted the Claim to the Insurers through its business manager and agent in Massachusetts, and received communications and conduct from the Insurers regarding the Claim through the Massachusetts-based business manager, as well.

177.    The Insurers had a duty to act in good faith when handling the Claim.

178.    The Insurers had a statutory duty to engage in fair settlement practices under M.G.L. c. 93A.

179.    The Insurers' systematic and summary denial of the Claim violated their duty of good faith and their statutory duty to engage in fair settlement practices.

180.    In particular, the Insurers violated their statutory obligations by engaging in, *inter alia*, the followings acts or practices related to the Claim:

(a)    misrepresenting pertinent facts or insurance Policy provisions relating to coverages at issue;

(b)    failing to act reasonably upon communications with respect to the Claim;

(c)    failing to adopt and implement reasonable standards for the prompt investigation of claims;

(d)     refusing to pay claims without conducting a reasonable investigation based upon all available information;

(e)     failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;

(f)     compelling TA to institute this litigation to recover amounts due under the Policy; and

(g)     failing to provide a reasonable explanation of the basis in the Policy in relation to the facts or applicable law for the denial of the Claim.

181.    The Insurers' acts and conduct occurred in such a manner as to appear to constitute its general business practice in the handling of such claims.

182.    The Insurers' acts and conduct constitute unfair or deceptive acts and practices in violation of Chapter 93A and/or Chapter 176D, section 3.

183.    As a direct, foreseeable and proximate result of the Insurers unfair and deceptive acts and practices, TA has sustained actual damages, including but not limited to the following:

(a)     the amount of the Claim, which is continuing;

(b)     expenses incurred after the Insurers breach of the Policy while pursuing the Claim, including attorney's fees; and

(c)     interest on the aforesaid damages.

184.    The Insurers' violations of M.G.L. c. 93A, Section 11 and/or c. 176D, Section 3, have caused and will continue to cause harm to TA, entitling TA to an award of actual damages, plus attorneys' fees.

185.    The Insurers violations of M.G.L. c. 93A, Section 11 and/or 176D, Section 3, were knowing and willful, entitling TA to an award of multiple damages.

WHEREFORE, Plaintiff respectfully requests that the Court:

1.    Declare that:

    (a)    The Claim triggers the various coverage provisions identified in this

        Complaint;

    (b)    the Policy covers the Claim;

    (c)    TA sustained direct physical loss or damage from a covered cause of loss

        under the Policy;

    (d)    no exclusion applies to bar or limit coverage for the Claim; and

    (e)    granting any other declaratory relief useful to resolving the dispute

        between the parties;

2.    Order the Insurers to provide coverage for the Claim under the Policy;

3.    Award damages, including actual, compensatory, consequential, special, exemplary, and punitive damages, against the Insurers in an amount to be determined at trial;

4.    Award pre-judgment, post-judgment, and statutory interest;

5.    Award attorneys' fees and costs of suit incurred; and

6.    Grant such other and further relief, including any equitable relief, as the Court deems just and proper.

WHEREFORE, Plaintiff respectfully requests a jury trial on all issues so triable.

\*\*\*

Dated: December 28, 2021                    HUNTON ANDREWS KURTH LLP

                                        By:   _____

                                        Harry L. Manion (BBO# 317440)
                                        Michael S. Levine (BBO# 633248)
                                        Christopher J. Cunio (BBO# 634518)
                                        Nicholas D. Stellakis (BBO# 644981)
                                        Lara D. Cassidy\*
                                        60 State Street, Suite 2400
                                        Boston, MA 02109
                                        Tel:  (617) 648-2800
                                        Fax:  (617) 433-5022
                                        hmanion@huntonAK.com
                                        mlevine@HuntonAK.com
                                        ccunio@HuntonAK.com
                                        nstellakis@HuntonAK.com
                                        lcassidy@HuntonAK.com
                                        David C. McSweeney (BBO# 654460)
                                        *Attorneys for Plaintiff*
                                        *TravelCenters of America Inc.*   DmcSweeney@
                                                                          HuntonAK.com

                                        \*pro hac vice forthcoming